## IN THE COURT OF APPEALS OF IOWA

No. 23-1198
Filed September 27, 2023

**IN THE INTEREST OF L.H.,**
**Minor Child,**

**J.K., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Story County, Stephen A. Owen, District Associate Judge.

        A father appeals the termination of his parental rights to his five-year-old daughter. **AFFIRMED.**

        Kelsey Knight of Carr Law Firm, P.L.C., Des Moines, (until withdrawal) and Katherine Scott, Ames, for appellant father.

        Brenna Bird, Attorney General, and Michelle R. Becker, Assistant Attorney General, for appellee State.

        Shannon M. Leighty of Public Defenders Office, Nevada, attorney and guardian ad litem for minor child.

        Considered by Tabor, P.J., Buller, J., and Gamble, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**TABOR, Presiding Judge.**

At age forty-nine, Jonathan learned he was a father for the first time. His daughter, L.H., was nearly five years old when paternity testing confirmed that Jonathan was her biological father.[1] Jonathan tried to build a relationship with L.H.—but struggled to master the necessary parenting skills. About fourteen months later, the juvenile court terminated Jonathan's parental rights. He appeals that order, contending the State did not prove any "real safety issues" that prevented him from assuming custody of his daughter. He also argues termination is not in L.H.'s best interests.

We recognize that Jonathan had the disadvantage of a late start and sincerely wants to be a part of L.H.'s life. But, like the juvenile court, we find he made "no real progress" toward becoming a capable parent.[2] And it is in L.H.'s best interests to stay with her foster family where her health needs are being met and she can maintain her close sibling relationship. Thus, we affirm.

## I.    Facts and Prior Proceedings

L.H. was born in 2017. She was "chronically neglected and abused" by her mother and legal father during her early years. One example of the neglect was her lack of medical and dental care. Untreated ear infections left L.H. with serious speech delays. To address those delays, L.H. had weekly speech therapy

---

[1] The juvenile court terminated the parental rights of L.H.'s mother and her legal father in March 2023. One month later, our court affirmed that termination order, which involved L.H. and two of her siblings. *In re K.H.*, No. 23-0636, 2023 WL 3856492, at *3 (Iowa Ct. App. June 7, 2023).

[2] We review termination decisions de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We respect the juvenile court's factual findings, but they do not dictate our result. *Id.* The State must prove the grounds for termination by clear and convincing evidence. *Id.*

appointments; she was also referred to an ear, nose, and throat specialist. And when her foster family took her to a dentist, she had nine painful cavities requiring attention. She started kindergarten with an individualized education plan (IEP) to address behaviors and academic goals.

L.H. has lived in the same foster home with her younger sister, K.H., since July 2022. The foster mother reported: "They're 11 months apart, so they have just a really, really strong bond. Whenever we go out, people often ask if they're twins, and they love that." While in foster care, L.H. has met all of her academic goals from her IEP and is making progress with her speech and language delays.

Jonathan is a disabled veteran who receives VA benefits. He did not know he was L.H.'s father until paternity testing in March 2022. But he did tell the Iowa Department of Health and Human Services that he had an idea that he was a potential father when she was born and had been "in and out" of her life since then. After the paternity test, Jonathan told the department he wished to be a placement option for L.H. In that spirit, he completed a web-based parenting class called Caring Dads.

He then started supervised visits with L.H. in June 2022. When he seemed to be making progress, the department granted him semi-supervised interactions. But they switched back to fully supervised in November 2022 and again in February 2023 when he exposed L.H. to adults that the department found "inappropriate" and asked her to keep it secret. The department also reported that Jonathan once encouraged L.H. not to tell the service provider that "she had not eaten all day and all she had was a Pepsi." The department advised him: "The secrets are a concern when it comes to [L.H.'s] needs and safety." The quality of

the visits varied. At times, L.H. resisted visiting her father, saying she was bored during their time together. But by July 2023, she was enjoying the weekly interactions with Jonathan. However, the department continued having concerns about some of Jonathan's conduct. For instance, at some visits he would provide L.H. with pop and candy, despite being advised that sugary snacks would exacerbate the pain from her dental work. At one visit, the service provider heard Jonathan warn L.H. that he would "blister her butt" for not listening. The provider had to explain that threats of physical harm were especially frightening for L.H., given the abuse she had been through in her mother's home. And the service provider noted a few times when Jonathan wanted to have the visits outside because he hadn't cleaned his apartment.

Also concerning, Jonathan was not diligent about scheduling or attending L.H.'s medical and therapy appointments, leaving most of that work to the foster mother. The record showed that he attended only three of her seventeen speech therapy sessions. But the record also shows that many of her appointments were in Ames, Jonathan lived in Des Moines, and transportation was difficult for him because his driver's license was suspended.

In June 2023, the State petitioned to terminate Jonathan's parental rights. After a July hearing, the court granted the petition, relying on Iowa Code section 232.116(1)(f) (2023).[3] Jonathan appeals.

---

[3] Under that provision, a court may terminate parental rights if all of the following have occurred:
> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

## II.    Analysis

## A. Statutory Ground

Jonathan argues the State failed to prove by clear and convincing evidence that L.H. could not be returned to his custody at the present time.[4] He asserts that he has a stable residence and "appropriate plans" for getting L.H. to her appointments and school "even without having a driver's license."

But the situation is not so straightforward.   L.H. has never lived with Jonathan.  In fact, he has not had unsupervised visitation with his daughter.  True, he has taken some initiative to succeed in his new role as a father.   But he acknowledges he has more to learn.  The juvenile court's comments captured the challenging circumstances: "Although he is a mature individual who has completed a lengthy parenting course, he acknowledges that his parenting skills need further development.  However, [L.H.] needs permanency sooner than later.  Although [Jonathan] is earnest and sincere, there has been no real progress toward placing [L.H.] with [him]."

Like the juvenile court, we are unsure that Jonathan, on his own, will ensure that L.H.'s special needs are met.  His novice parenting skills are not a good match for her vulnerable condition.  *See In re J.E.*, 723 N.W.2d 793, 799 (Iowa 2006)

---

(3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

[4] At the "present time" refers to the point of the termination hearing.  *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014).

6

(holding mother could not devote necessary attention to child with special needs). So far, Jonathan has been content to have the foster mother manage L.H.'s many appointments with therapists and specialists. Nothing in the record suggests that he would rise to the occasion and embrace those demanding duties if L.H. were now placed in his custody. *See In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010) ("[T]he father has very poor decision-making skills and his poor decision making makes him unable to provide a safe and nurturing home for his child."). We find the State offered clear and convincing evidence that L.H. could not be safely returned to her father's care at this point.

### B. Best Interests

Jonathan last argues that terminating his parental rights is not in L.H.'s best interests. He acknowledges she is "well cared-for at the foster home," but insists that she could be safely returned to his custody.

In deciding this best-interests challenge, we consider L.H.'s safety, the best placement for furthering her long-term nurturing and growth, and her physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2). We also weigh her integration into the foster family. *See id.* § 232.116(2)(b). Applying those factors, we conclude termination is in L.H.'s best interests. Again, L.H. has never lived with Jonathan. And he hasn't shown the ability to provide for her physical and emotional needs. After suffering abuse and neglect in her mother's home, she is thriving in the care of her foster parents, who are willing to adopt both L.H. and her sister. The foster mother testified eloquently about the close relationship between the sisters. Preserving that sibling bond will support L.H.'s nurturing and growth. *See In re A.M.S.*, 419 N.W.2d 723, 734 (Iowa 1988)

("[S]iblings should not be separated without good and compelling reasons.").

Considering these factors, we find termination in L.H.'s best interests.

**AFFIRMED.**